IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AMANDA BROOKE HAILEY, Personal    :
Representative of the Estate of
Charles Anthony Shockley, et al.:

         v.                       :   Civil Action No. DKC 18-2590

                                  :

AIR AND LIQUID SYSTEMS
CORPORATION, et al.               :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this multidefendant asbestos wrongful death case are the motions for summary judgment on all claims and cross-claims filed by the five remaining defendants: Air and Liquid Systems Corp. (f/k/a "Buffalo Pumps") ("Air and Liquid"), (ECF Nos. 82, 83, 84, 85), Crane Co. ("Crane"), (ECF No. 87), CBS Corp. (f/k/a Westinghouse Electric Corporation and B.F. Sturtevant) ("CBS"), (ECF No. 88), General Electric Co. ("GE"), (ECF No. 89), and IMO Industries, Inc. (f/k/a DeLaval Turbine, Inc.) ("IMO"), (ECF Nos. 91, 92). Also pending are separate motions for summary judgment on cross-claims for contribution filed against cross-defendants: The Goodyear Tire & Rubber Co. ("Goodyear"), (ECF No. 75), Greene, Tweed & Co., Inc. ("Greene Tweed"), (ECF No. 79), and John Crane-Houdaille, Inc. ("Crane-Houdaille"), (ECF No. 86). Finally, Plaintiffs have filed a motion for partial summary judgment as to certain affirmative defenses raised by Air and Liquid, GE, Crane, CBS, and IMO. (ECF

No. 90).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, all of Defendants' motions for summary judgment and all of Cross-Defendants' motions for summary judgment will be granted, while Plaintiff's motion for partial summary judgment will be denied as moot.

## I.   Background

Charles Anthony Shockley served in the United States Navy ("USN" or the "Navy") during the late 1960s and early 1970s.  From 1968 until 1972, Mr. Shockley worked as a machinist mate aboard the USS Henderson.  The Henderson was a "Gearing-Class" destroyer, built in the 1940s and commissioned in 1945.  Like all Navy ships built before the 1970's, the Henderson contained much asbestos. Defendants are companies, or their successors, that supplied equipment initially installed on the ship.  Plaintiffs' claims stem from the assertion that asbestos used in conjunction with each Defendant's product created dust that was inhaled as people such as Mr. Shockley worked on, maintained, and repaired the equipment.

Over the decades after commissioning, the Henderson underwent a series of overhauls which resulted in the replacement of much of the original machinery aboard the ship.  When, in 1968, Mr. Shockley began serving aboard the Henderson, it is unclear how

much of the original machinery installed aboard the Henderson was still present.

During his time aboard the Henderson, Mr. Shockley worked primarily in the aft engine room.  The Henderson also had a forward engine room and two fire rooms.  There is, however, no evidence regarding any work Mr. Shockley performed aboard the Henderson other than his work in the aft engine room.   Plaintiffs have only one fact witness: Jerry Wanner, who served with Mr. Shockley exclusively in the aft engine room from summer 1970 until Mr. Shockley's discharge from the Navy in 1972.

Plaintiffs also have a series of expert witnesses, the most important of whom was Former Navy Captain Arnold Moore.  Captain Moore was able to testify as to the equipment originally installed on the Henderson in 1945.  This testimony included identifying specific Defendants' products which were installed aboard the ship at the time of its commissioning.  Captain Moore, however, was not able to testify as to *where* aboard the Henderson a given product had been installed.  Captain Moore also noted that the Henderson underwent a "Fleet Rehabilitation and Modernization" in the early 1960s, along with overhauls every few years.  During Mr. Shockley's time aboard the Henderson, the ship's home port was the Long Beach Navy Yard, and the Henderson went on one seven-to-eight month tour to Vietnam.

In October 2015, Mr. Shockley was diagnosed with malignant pleural mesothelioma.  Mr. Shockley passed away as a result of this asbestos-related mesothelioma in January 2016.

On July 3, 2018, Plaintiff Amanda Brooke Hailey, as Personal Representative of the Estate of Charles Anthony Shockley ("Mr. Shockley"), and Robin L. Shockley, as surviving spouse of Mr. Shockley, filed a complaint in the Circuit Court for Baltimore County.  That complaint named Tabitha Simmons, the surviving child of Mr. Shockley, as a use plaintiff.  The complaint also named eleven different defendants, all alleged tortiously to have contributed to Mr. Shockley's death by exposing Mr. Shockley to asbestos during his service aboard the Henderson in the years 1969-1972.  Plaintiffs brought claims of strict liability, breach of warranty, negligence, fraud, conspiracy, and market share liability.  (ECF No. 1-1).[1]

_____

[1] As recognized in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1162 (4th Cir. 1986), "[a]s asbestos litigation has developed over the past decade, most plaintiffs sue every known manufacturer of asbestos products, and during the course of discovery some of the defendants are dismissed on motions for summary judgment because there has been no evidence of any contact with any of such defendants' asbestos-containing products.  Other defendants may be required to go to trial but succeed at the directed verdict stage.  Some defendants settle prior to trial, and these are usually the defendants whose products have been most frequently identified by the plaintiff and his witnesses as having been used by the plaintiff or by others in his presence or working near him."

On August 21, 2018, this case was removed to this court.  (ECF No. 1).  On August 29, 2018, the parties agreed to stipulate:

> that as to each duly sued and served Defendant, upon its filing its Answer to Complaint, it is automatically deemed to have asserted a cross-claim for contribution against each and every other duly sued, served and answering Defendant, and that all such deemed cross-claims are also deemed to have been answered with complete denials of liability.

(ECF No. 26, at 2).

In the ensuing weeks, Plaintiffs stipulated to the dismissal of three of the original 11 defendants: Warren Pumps, Inc., ("Warren Pumps") (ECF No. 42), Foster Wheeler, LLC, ("Foster Wheeler") (ECF No. 77), and Metropolitan Life Ins. Co. ("Metropolitan"), (ECF No. 101).  Metropolitan and Foster Wheeler have since been terminated as defendants, cross-defendants, and cross-plaintiffs and are no longer parties to this case.[2]  Warren Pumps, however, remains a party to this case as a cross-defendant, although it has withdrawn its own deemed cross-claims against the remaining defendants.  (ECF No. 47).

The court also approved joint motions for voluntary dismissal against defendants John Crane, Inc., Goodyear, and Greene Tweed. (ECF No. 62).  Certain – though not all – of the remaining cross-

---

[2]  Foster-Wheeler's third-party complaint for contribution against the Manville Trust Personal Injury Settlement Trust (ECF No. 14) may remain pending, but will be dismissed.  It does not appear that service was ever effected.

plaintiffs subsequently agreed to dismiss their cross-claims against Goodyear. (ECF No. 72). However, none of the remaining cross-plaintiffs – except Warren Pumps, mentioned above – have dismissed their cross-claims against cross-defendants Crane-Houdaille, Greene Tweed, Warren Pumps, Air and Liquid, Westinghouse, IMO, or GE.

In summary:

1. Amanda Brooke Hailey and Robin L. Shockley remain parties as plaintiffs only.

2. Tabitha Simmons remains a party as use plaintiff.

3. Air and Liquid, Westinghouse, GE, IMO, and Crane remain parties as defendants, cross-defendants, and cross-plaintiffs.

4. Crane-Houdaille, Goodyear, and Greene Tweed remain parties as cross-defendants and cross-plaintiffs.

5. Warren Pumps remains a party as a cross-defendant only.

6. Metropolitan and Foster Wheeler have been terminated from the case.

In early March 2020, Plaintiffs indicated that they would *not* respond to, or oppose, each and every motion for summary judgment. In a letter dated March 9, Plaintiffs stated that they:

> will not be opposing all Motions for Summary Judgment filed by Defendants as to Plaintiffs' Breach of Warranty, Civil Conspiracy, Market Share Liability, Fraud, and Aiding and Abetting claims. In addition, Plaintiffs will not be opposing the Motions for Summary Judgment as to Plaintiffs' claims for punitive damages as they relate to Defendants IMO Industries, Inc. and Air & Liquid Systems

> Corporation.  All other Motions for Summary
> Judgment will be opposed.

(ECF No. 95).

Plaintiffs ultimately filed a series of responses.  (ECF Nos. 106, 107, 108, 109, 111, 112).  In their responses, Plaintiffs only respond to certain aspects of Defendants' motions for summary judgment.  Plaintiffs have stated that they do not oppose summary judgment as to any of their Breach of Warranty claims and, apparently, to Market Share claims.  For Defendants Air and Liquid, IMO, and Crane, Plaintiffs limit their opposition exclusively to the issue of "substantial factor causation," described in detail below.  For Defendants CBS and GE, Plaintiffs are "opposing [each of these defendant's] Motion[s] for Summary Judgment to the extent [they] appl[y] to Plaintiff's civil conspiracy, fraud, punitive damages and substantial factor causation claims."  (ECF No. 108, at 9; ECF No. 111, at 11).  Plaintiffs have filed separate responses specifically opposing GE's and CBS's motions for summary judgment as they apply to the issue of punitive damages.  (ECF Nos. 109, 112).

Each of the remaining Defendants – GE, CBS, Air and Liquid, Crane, and IMO – have replied.[3]  (ECF Nos. 113, 115, 116, 117, 118,

---

[3] CBS filed several separate replies: one reply as to the substantive causes of action, (ECF No. 116), one as to Plaintiffs' claims for punitive damages, (ECF No. 117), and one relating to CBS's invocation of the government contractor defense, (ECF No. 115).

119, 120).  Finally, while Plaintiffs have sought partial summary judgment regarding certain affirmative defenses against all of the remaining defendants, (ECF No. 90), only three Defendants have responded.   CBS, (ECF No. 90), GE, (ECF No. 99), and IMO each filed responses in opposition to Plaintiffs' motion for partial summary judgment.  Plaintiffs, in turn, replied.  (ECF No. 114).

## II.  Standard of Review

"Under [Federal Rule of Civil Procedure] 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts.  *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987).  If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial.  *See Celotex*, 477 U.S. at 322–23.   To defeat the motion, the nonmoving party must submit evidence showing facts sufficient for a fair-minded jury to reasonably return a verdict for that party.  *See Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 252 (1986).

8

## III. Analysis

The claims which Plaintiffs actively argue should survive summary judgment all sound in tort.  Causation is therefore an indispensable element of each claim.  In other words, in order to survive summary judgment on their claims of fraud, civil conspiracy, negligence, or strict liability, Plaintiffs must raise a genuine dispute of material fact as to whether Defendants' products caused Mr. Shockley's mesothelioma.

The parties do not agree on which law governs the claims at issue in this case.  Plaintiffs have taken the position that Maryland law applies to all of their claims, but include no choice of law analysis.  Defendant Air & Liquid takes the same approach. (ECF No. 85).  Defendant Westinghouse argues that maritime law applies.  (ECF No. 88-1, at 15-16).  Defendant GE does the same, but notes that "the maritime law 'substantial exposure' standard is consistent with the 'regularity, frequency, and proximity' test used by many courts around the nation to assess whether a showing of defendant-specific causation has been made in a toxic exposure suit."  (ECF No. 89-3, at 7).  In a similar vein, Defendants IMO and Crane are indifferent as to which law applies, arguing instead that summary judgment is appropriate no matter which law applies. (ECF No. 91, at 6; ECF No. 87, at 8).  Regardless of which body of law they argue applies to this case, however, the defendants all

9

suggest that Plaintiffs cannot carry their burden to establish causation for any of their tort claims.

*Lindstrom v. A-C Product Liability Trust*, 424 F.3d 488 (6th Cir. 2005), is the leading case in defining the standard for causation in asbestos cases under federal maritime law. In that decision, the United States Court of Appeals for the Sixth Circuit explained that in order to establish causation, a plaintiff must show, "for each defendant, that (1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Id.* at 492 (citing *Stark v. Armstrong World Indus.*, 21 Fed.Appx. 371, 375 (6th Cir. 2001)). *Lindstrom* further explains:

> [W]e have permitted evidence of substantial exposure for a substantial period of time to provide a basis for the inference that the product was a substantial factor in causing the injury. [*Stark*, 21 Fed. Appx.] at 376. "Minimal exposure" to a defendant's product is insufficient. *Id.* Likewise, **a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient**. *Id.* Rather, where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show "'a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural.'" *Id.* (quoting *Harbour v. Armstrong World Indus., Inc.*, 1991 WL 65201, at *4 (6th Cir. Apr. 25, 1991)). In other words, proof of substantial exposure is required for a finding that a product was a substantial factor in causing injury.

*Id.* (emphasis added). The substantial exposure standard is applied separately to each defendant. *Id.* at 493.

As other courts have noted, this standard is "in line with many state court decisions, requiring that there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked (i.e., the 'regularity, frequency, and proximity' test [laid out in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4ᵗʰ Cir. 1986)])." *Cabasug v. Crane Co.*, 989 F.Supp.2d 1027, 1034 (D. Haw. 2013), *abrogated by Air & Liquid Sys. Corp. v. DeVries*, 139 S.Ct. 986, 203 L.Ed.2d 373 (2019). The *Lohrmann* test is summarized as follows: "To support a reasonable inference of substantial causation from circumstantial evidence, there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." *Lohrmann*, 782 F.2d at 1162–63.

Under either standard, in order to defeat a motion for summary judgment, a Plaintiff must do more than establish that the Defendant's product was present somewhere in the decedent's workplace. *Lindstrom* itself is explicit on this point. *Lindstrom*, 424 F.3d at 492 ("a mere showing that defendant's product was present somewhere at plaintiff's place of work is insufficient"). Under the *Lohrmann* test, Maryland courts have adopted much the same requirement. In *Eagle-Picher Indus., Inc. v. Balbos*, 326 Md.

179, 210, 604 A.2d 445, 460 (1992), the Court of Appeals of
Maryland noted that substantial factor causation analysis
"involves the interrelationship between the use of a defendant's
product at the workplace and the activities of the plaintiff at
the workplace. This requires an understanding of the physical
characteristics of the workplace[.]"  In a later case, the Court
of Appeals of Maryland made clear that a Plaintiff must establish
that a Defendant's "products were used at the specific cite(s)
where the [decedent] actually worked."  *Reiter v. Pneumo Abex,
LLC*, 417 Md. 57, 73-74 (2010).

Both Maryland and maritime law require significant exposure
to meet the causation requirement.  Courts applying each of these
standards have stressed the importance of understanding the
physical dimensions of the workplace where a decedent worked.  In
other words, whether the court is looking for proof of "regular,
frequent" exposure or "substantial exposure," evidence of *actual*
exposure to Defendant's specific products is a baseline
requirement – and one that cannot be met merely by proving that
the defendant's products were present at a decedent's workplace.

This overlap between maritime standards and state law
standards of the type laid out in *Lohrmann* is not a coincidence.
As the United States Supreme Court has noted, maritime law is "'an
amalgam of traditional common-law rules, modifications of those
rules, and newly created rules,' drawn from both state and federal

sources." *Saratoga Fishing Co. v. J.M. Martinac & Co.*, 520 U.S. 875, 878 (1997) (citing *East River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865,; *see also Fitzgerald v. United States Lines Co.*, 374 U.S. 16, 20 (1963); *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959).

As set forth below, Plaintiffs' claims fail regardless of which body of law applies, because they cannot meet their burden to establish causation for any of their tort claims. As such, "[w]e need not resolve this choice of law issue because we . . . conclude that the result is the same regardless of whether [Maryland or maritime law applies.]" *In re Marine Energy Sys. Corp.*, 299 F.App'x 222, 228 (4th Cir. 2008).

**A.   Air and Liquid (ECF Nos. 82, 83, 84, 85)**

In four separate motions, Defendant Air and Liquid, the successor by merger to Buffalo Pumps, Inc. ("Buffalo Pumps"), moves for summary judgment on all claims pending against it. At issue presently is its argument that "there is no genuine dispute of material fact as to whether any product for which Buffalo Pumps is responsible was a substantial contributing factor to Mr. Shockley's alleged development of mesothelioma." (ECF No. 85, at 6). "Plaintiffs do not oppose the Motions for Summary Judgment filed by Air & Liquid Systems (Buffalo Pumps) as to Breach of Duty

[*sic*][4], Punitive Damages, Civil Conspiracy, Fraud and Aiding and Abetting.  Plaintiffs do oppose Defendant Air & Liquid Systems (Buffalo Pumps) Motion for Summary Judgment as to Substantial Factor Causation."  (ECF No. 107, at 15).

The most significant piece of evidence tying an Air and Liquid product to Mr. Shockley's mesothelioma is the testimony of Captain Moore.  Captain Moore, in his expert report, testified that certain pumps made by Buffalo Pumps were installed on USS Henderson during its construction in 1944-45.  (ECF No. 107-6, at 10-13).[5]  According to Captain Moore, four discrete types of Buffalo Pumps brand pumps were, at least at one point, located aboard the Henderson:  (1) "Buffalo manufactured four main feed booster pumps . . . for HENDERSON as recorded in the synopsis.  Two [main] feed booster pumps were located in each engineroom[,]" (*Id.* at 10), (2) Buffalo manufactured "[t]he auxiliary condenser circulating pumps" aboard the Henderson, (*id.*), (3) "Buffalo Pumps manufactured the electric motor driven pumps that served these distilling plants on HENDERSON," (*id.* at 13), and (4) "One motor-driven fire and flushing pump was located in each engine room on HENDERSON.  The

---

[4] Plaintiffs here refer to their claim as "breach of duty," an obvious typographical error, as Plaintiffs originally brought a breach of *warranty* claim.

[5] At his deposition, the parties referred to an amended, or updated, report that referred to Mr. Wanner's deposition. (ECF No. 107-9, at 12-13).  The summary judgment record does not contain that updated report.

fire and flushing pumps were manufactured by Buffalo Pumps[,]" (*id.*).

Captain Moore's report only definitely ties one of the four Buffalo Pumps products to Mr. Shockley's actual work area, the aft engine room.  The fire and flushing pumps were the only products which Captain Moore could specifically say were located in the aft engine room.  He provides no detail as to the location of the electric motor driven pumps, and leaves open the possibility that the main feed booster bumps located in the aft engine room may have actually been manufactured by another defendant in this case – DeLaval, presently IMO.

Air and Liquid also notes that "[s]ince 1945, Henderson underwent a major reconfiguration known as a Fleet Rehabilitation and Modernization (FRAM) in the early 1960s . . . and overhauls every 2.5 to 3 years." (ECF No. 85, at 7) (citing ECF No. 85-2, excerpts of the deposition testimony of Captain Moore).  Air and Liquid does so to raise the possibility that Buffalo Pumps products were no longer present aboard the Henderson by the time Mr. Shockley arrived aboard that vessel.  Air and Liquid, however, claims that their "[m]otion's success does not seek to exploit that uncertainty." (*Id.*).  While that is true, the uncertainty over which Buffalo Pumps products were actually still aboard the Henderson during Mr. Shockley's service, combined with Mr. Wanner's lack of memory regarding Buffalo Pumps – discussed in

greater detail below – raises further doubts that a reasonable juror could find that Buffalo Pumps constituted a "substantial factor" in causing Mr. Shockley's mesothelioma.

Rather than "exploiting" this uncertainty, or relying on a "bare metal defense," Air and Liquid argues that "[t]o decide this Motion, the Court's inquiry is simply whether the record supports the conclusion that Mr. Shockley was regularly and frequently exposed to such components on Buffalo Pumps machinery. The record falls far short of that support." (ECF No. 85, at 8). Air and Liquid is correct.

Captain Moore, who was not present aboard the Henderson with Mr. Shockley, cannot attest to the frequency, regularity, or substantiality of Mr. Shockley's work with Buffalo Pumps. For that purpose, the parties – and therefore the court – rely exclusively on the testimony of Mr. Wanner. Mr. Wanner could not initially name the manufacturer of any pump he or Mr. Shockley worked on during their time aboard the Henderson. (ECF No. 107-5, at 25, 231).[6] Mr. Wanner said that he did not "remember the names, the manufacturer" when asked to identify the manufacturer

---

[6] The depositions of Mr. Wanner and Captain Moore appear at numerous places in the record, as most of the parties have filed excerpts of those depositions in support of their papers. Hereafter, all citations to the deposition of Mr. Wanner will refer to ECF No. 107-5, the only complete record of the deposition transcript. Likewise, all citations to the deposition of Captain Moore will refer to ECF No. 107-9.

of the pumps he worked with in the aft engine room.   (*Id*. at 25).
Later, when asked if he recalled the name "Buffalo," Mr. Wanner
suggested that he did, but could not recall if he had heard of
Buffalo Pumps while aboard the Henderson or in a later job.   (*Id*.
at 381-82).

While Plaintiffs can establish that work on or with Buffalo
Pumps products – if they were still in use aboard the Henderson –
would likely have given off respirable asbestos fibers, there is
nothing in the record to suggest that Mr. Shockley was exposed to
such fibers with the required regularity or frequency.   Plaintiffs
devote much of pages 17 to 20 of their opposition to describing
Mr. Shockley's and Mr. Wanner's work aboard the Henderson.   (ECF
No. 85, at 17-20).   In so doing, Plaintiffs admittedly describe
dirty, dangerous work with what is likely asbestos.   Mr. Wanner
believed that he and Mr. Shockley were exposed to asbestos.   (ECF
No. 107-5, at 19-20).   And Mr. Wanner described work on pumps which
he believes resulted in breathing in asbestos.   (*Id*. at 28-31, 46-
49, 339-343).

What is missing from this testimony is any degree of
specificity as to *which brand* of pumps Mr. Wanner and Mr. Shockley
were working on when they believed they were breathing in asbestos.
As Air and Liquid puts it, "Mr. Wanner generally testified that
Mr. Shockley changed gaskets and packing on a variety of different
kinds of pumps, but provided no testimony regarding how often or

closely Mr. Shockley worked with the gaskets and packing on a
Buffalo pump." (ECF No. 85, at 7).

The evidence presented in this case closely mirrors the
evidence presented in *Reiter v. Pneumo Abex, LLC*, 417 Md. 57, 73-
74 (2010), a case where the Court of Appeals of Maryland upheld
summary judgment against plaintiffs. There, the plaintiffs
alleged that Mr. Reiter was exposed to asbestos in the course of
his work in a tin mill:

> Mr. Reiter worked on a daily basis in the
> 50 square feet of the tin mill reserved for
> the coil prep line. His plaintiff-specific
> witness testified that overhead cranes were
> used to move coils in the area where he and
> Mr. Reiter worked, and that the cranes would
> generate dust that they would breathe in.
> This testimony, however, does not establish
> that a Square D product was used on the cranes
> at that specific site. Evidence that some
> Square D products were used somewhere in the
> 480 acre tin mill does not establish that a
> Square-D product was on the crane that was in
> the 50 square feet where Mr. Reiter "actually
> worked."

*Reiter*, 417 Md. at 73-74.

There, as here, there was evidence to suggest that a
defendant's product was - or had been - present somewhere in the
plaintiff's broader workplace. What was lacking, however, was any
evidence tying a defendant's product to a plaintiff's specific
worksite, rather than to the larger place of work. Whether that
larger place of work is a tin mill or a destroyer, both *Lohrmann*

and *Lindstrom* require proof beyond what was provided in *Reiter* and what has so far been provided in the instant case.

Again, Mr. Shockley's work, according to Mr. Wanner, was limited to the aft engine room. And again, neither Mr. Wanner nor Captain Moore can definitively place a Buffalo Pump product in the aft engine room of the Henderson. While it is theoretically possible to conjecture that the original Buffalo Pumps products were still present decades later, there is no evidence that Mr. Shockley worked on a Buffalo Pump product with sufficient frequency and regularity for the asbestos from said pump to constitute a substantial factor in causing Mr. Shockley's mesothelioma.

*Reiter* followed the Maryland Court of Appeals' guidance from *Balbos*, 326 Md. at 210, which, again, noted that substantial factor causation analysis "involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace. This requires an understanding of the physical characteristics of the workplace[.]" In *Reiter*, the plaintiff's actual workplace, a tin-mill, was massive. The plaintiff's actual work area, however, was relatively small: an area of about 50 square feet. *Reiter*, 417 Md. at 72.

As plaintiffs themselves note, the aft engine room was far larger than 50 square feet:

> There were three levels to the aft engine room and each level was ten to 12 feet in height. Overall, the engine room was

19

> approximately 30 to 35 feet tall.  Mr. Wanner
> stated in his deposition that the aft engine
> room was roughly 80 feet by 160 feet.  Ten to
> 12 people worked in the aft engine room at a
> time.

(ECF No. 107, at 15).  Thus, even if there were evidence that someone working on a Buffalo Pump caused asbestos exposure somewhere in the aft engine room, it does not follow that Mr. Shockley would have necessarily been exposed to asbestos from a Buffalo Pump product regularly or frequently.

Based on the evidence produced to date, "[t]here is no way to assess the actual number of times Mr. Shockley performed any particular service on any particular pump." (ECF No. 118, at 7). Add to this the uncertainty as to whether *any* Buffalo Pumps products were actually still present in the aft engine room from 1969 to 1972 and it becomes impossible for a reasonable juror to find that the substantial factor causation requirement is met under either the *Lohrmann* or *Lindstrom* standards.  There is a great deal of uncertainty as to the extent of the work – if any – that Mr. Shockley performed on asbestos-bearing Buffalo Pumps products nearly 50 years ago.  There is not, however, a genuine dispute of material fact: Plaintiffs have simply not established that Mr.

Shockley was regularly or frequently exposed to asbestos by virtue of work with specifically Air and Liquid products.

### B.   Crane (ECF No. 87)

All of the above reasoning applies with equal or greater force to Defendant Crane, as indeed it does to all of the defendants. Whereas Air and Liquid manufactured pumps, Crane manufactured valves.  Again, Captain Moore's testimony is critical.  But again, it falls short of establishing substantial factor causation.

Unlike in the case of Air and Liquid, Captain Moore expressed confidence that Crane valves would not have been replaced during an overhaul between the Henderson's construction in 1945, and Mr. Shockley's service.  In other words, Captain Moore was able to testify that Crane valves were present on the Henderson in 1945, and very likely still present from 1969 to 1972.  (ECF no. 107-9, at 341-342).  He testified that any valves or equipment supplied by Crane would have been in a "bare state" without any insulation on the outside.  (*Id.* at 336).

Because of the great size and weight of the type of valves Crane produced, "these valves were almost never replaced on board the ship."  (*Id.* at 341).  Unlike with regard to Air and Liquid, however, Captain Moore was *not* able to say whether any of the Crane products aboard the Henderson were ever located in the aft engine room.  (*Id.* at 342-43).  When pressed, Captain Moore noted that he "would not be able to say that Mr. Shockley replaced packing

21

specifically on a Crane valve." (*Id*. at 349).  Captain Moore did,
however, state that "it's more likely than not with 38 [Crane]
valves on the ship at least some were in the aft engine room more
likely than not." (*Id*. at 351).

Mr. Wanner's testimony on the presence of Crane valves in the
aft engine room provides little more guidance in establishing
substantial factor causation.  He testified that there were
probably 40-50 valves in the aft engine room.  (ECF No. 107-5, at
272).  When asked what types of valves were present, Mr. Wanner
responded "I don't know that.  What type they were." (*Id*.).  When
asked, in a follow-up, if there were more than two or three "Crane
valves," Mr. Wanner responded, "I'm sure there probably was."
(*Id*.).  Just two questions later, though, Mr. Wanner thought better
of his assessment, and stated "I'm not even sure they was any
Crane[ valves] at all.  That name just sound – just come to mind.
It sounded familiar." (*Id*. at 274).

Mr. Wanner was able to describe the type of work he did on
valves – work which it does appear possibly exposed him and Mr.
Shockley to asbestos.  But Mr. Wanner was again unable to make the
leap from "work on asbestos-bearing valves" to "work on asbestos-
bearing *Crane* valves."  And even assuming that Crane valves were
present in the aft engine room, and assuming that Mr. Wanner and
Mr. Shockley were exposed to asbestos in the process of their work
on valves, this is not enough to survive summary judgment on the

22

issue of substantial factor causation.  This is because Mr. Wanner testified that some valves in the aft engine room required no work at all and "were never even opened."  (ECF No. 107-5, at 279). What is more, even if Mr. Shockley did work on a Crane valve which gave off respirable asbestos, there is no evidence that he did so with the requisite frequency or regularity.

Plaintiffs' case for establishing substantial factor causation turns on a chain of uncertainties.  It is uncertain whether Crane valves were ever present in the aft engine room.  It is uncertain whether any Crane valves initially present in that engine room were subsequently replaced.[7]  It is uncertain whether – even if present – any Crane valves required any work at all.  It is uncertain whether any Crane valves, if present and if requiring work, were actually worked on by Mr. Shockley and not someone else. And it is uncertain whether – if present, and if requiring work, and if Mr. Shockley did that work – Mr. Shockley actually did such work regularly or frequently enough for specifically Crane valves to have been a substantial factor in causing Mr. Shockley's

---

[7] Mr. Wanner, in his deposition, suggested that valves were replaced with great frequency, potentially belying Captain Moore's testimony on the unlikelihood of their being replaced.  (ECF No. 107-5, at 293).  Mr. Wanner seemed to be describing work primarily on valves smaller than those which Captain Moore had in mind.  (*Id*. at 274).  Still, Mr. Wanner was highly confident that none of the original valves remained on the Henderson, as he surmised that while he was on board, about 10 to 12 of the roughly 50 valves in the aft engine room were replaced.  (*Id*. at 293).

mesothelioma.   Given these layers of uncertainty, Plaintiffs have
not raised a genuine dispute of fact as to whether work involving
asbestos on Crane valves constituted a substantial factor in
causing Mr. Shockley's mesothelioma.

###    C.   CBS (ECF No. 88)

CBS Corporation (a Delaware corporation f/k/a Viacom, Inc.)
is the successor by merger to CBS Corporation (a Pennsylvania
corporation f/k/a Westinghouse Electric Corporation).   In a
"Synopsis and related documents pertaining to the USS Henderson,"
Plaintiffs identify five Westinghouse products installed in the
aft engine room: (1) a Westinghouse main condenser circulating
pump turbine, (2) two main feed booster pump turbines, (3) a
Westinghouse motor drive auxiliary condensate circulating pump,
(4) a Westinghouse motor drive fire and flushing pump, and (5) a
B.F. Sturtevant (n/k/a Westinghouse/CBS) gland leak-off exhauster.
(ECF No. 111-7).

In his expert report, Captain Moore identified several
Westinghouse products installed on the Henderson at the time of
its construction.   Specifically, Captain Moore notes that "a
Westinghouse steam turbine" drove the main condenser circulating
pump in each engine room, (ECF No. 107-6, at 8), and a
"Westinghouse steam turbine" drove the four main booster pumps,
two of which were located in each engine room, (*id.* at 10). Captain
Moore, in his deposition, stated that these were the only possible

Westinghouse-specific sources of asbestos exposure for Mr. Shockley, as these were the only Westinghouse products in the aft engine room.  (ECF No. 107-9, at 242-44).

CBS argues that substantial factor causation is lacking because "Plaintiffs have, at most, tendered evidence that Mr. Shockley performed unspecified work on Westinghouse turbines on an unspecified number of occasions, while wholly failing to offer evidence that any of this work disturbed the insulation associated with those pumps or otherwise exposed Mr. Shockley to asbestos." (ECF No. 88-1, at 17).  In their response, Plaintiffs recite much the same description of Mr. Shockley's work as they do in response to the motions of the other defendants.  CBS, in its reply, notes that "the bulk of Plaintiffs' opposition brief is spent urging that Mr. Shockley had substantial cumulative exposure to asbestos from his work on the Henderson, with no attempt made to differentiate between asbestos associated with Westinghouse equipment and asbestos used with non-Westinghouse equipment." (ECF No. 116, at 4).

CBS is correct.  Plaintiffs are simply unable to define with any degree of clarity what work Mr. Shockley did specifically on Westinghouse products.  In their opposition, the only Westinghouse-specific piece of evidence they proffer from their plaintiff-specific witness is that "Mr. Wanner testifies that it is his belief that the turbines in the aft engine room on the USS

Henderson were Westinghouse." (ECF No. 111, at 13). As noted above, Captain Moore himself provided evidence to the same effect. What is lacking, then, is any evidence suggesting that Mr. Shockley worked on asbestos-bearing Westinghouse products with the requisite degree of frequency or regularity.

As CBS points out, "Plaintiffs extensively discuss Mr. Shockley's asbestos exposure arising from an alleged instance when he helped remove insulation from one of the Henderson's main propulsion turbines, despite the fact that it is undisputed that Westinghouse did not manufacture or supply that turbine." (ECF No. 116, at 4-5). Again, the only Westinghouse turbines Mr. Shockley would have worked on in the aft engine room were (1) the main condenser pump turbines, and (2) the main booster pump turbines. (ECF No. 107-6, at 8, 10). Work on the "main propulsion turbines" is irrelevant to the question of whether Westinghouse products caused Mr. Shockley's mesothelioma. As to the turbines which Mr. Wanner states that Mr. Shockley *may* have worked on, Mr. Wanner's sworn testimony is that "[w]e didn't do much work on those." (ECF No. 107-5, at 127).[8]

CBS raises other significant issues with Plaintiffs' efforts to tie Westinghouse products to Mr. Shockley, including the

---

[8] Specifically, Mr. Wanner was asked about turbines other than the "main propulsion" turbines, or the turbines that drove the "little pumps that [Mr. Wanner and Mr. Shockley] worked on[.]" (ECF No. 107-5, at 126-27).

possibility that work on Westinghouse turbines would not necessarily generate respirable asbestos.  (ECF No. 111, at 17). These additional points are not necessary to the success of their motion.  There is simply nothing to suggest that Mr. Shockley was exposed to asbestos by virtue of work on Westinghouse products with the necessary degree of frequency or regularity.  The record is incredibly sparse as to any Westinghouse-specific evidence; it is limited to Captain Moore's testimony that certain Westinghouse products were aboard the Henderson, and that Mr. Wanner recalled certain Westinghouse turbines, but that he recalled neither he nor Mr. Shockley doing much work on these turbines.

Under both maritime and Maryland law, ""[s]ubstantial factor causation is determined with respect to each defendant separately." *Fauci v. 3M Co.*, 2013 WL 5544373 at *1 n.1 (E.D. Pa. May 13, 2013).  Plaintiffs have not raised a genuine dispute of material fact simply by reciting the facts of Mr. Shockley's general exposure to asbestos aboard the Henderson.

### D.   GE (ECF No. 89)

According to Captain Moore, GE "manufactured two sets of main propulsion steam turbines for HENDERSON. One set was installed in each engine room."  (ECF No. 107-6, at 7).  GE also "manufactured the ship's service generators for HENDERSON as recorded in General Electric drawing list 3736812. Two of these generators were installed on HENDERSON, one in each engine room."  (*Id*. at 12).

27

As for Mr. Wanner, when asked "as you sit with me here today, are you able to give any testimony that you ever worked on – a turbine made by General Electric?" Mr. Wanner replied, "I don't recall what kind they was." (ECF No. 107-5, at 128-129).

As was the case with Westinghouse, Plaintiffs have not put forward any evidence of regular or frequent work on asbestos-exposing GE products. Mr. Wanner was not able to recall *any* work on a GE turbine. (*Id.*). In order to defeat summary judgment, Plaintiffs must raise a genuine dispute of material fact as to whether (1) Mr. Shockley worked on GE products frequently or regularly, (2) that said GE products exposed Mr. Shockley to asbestos, and (3) that the asbestos exposure from work on these products was a "substantial factor" in causing Mr. Shockley's mesothelioma. While GE focuses on whether or not GE turbines were actually insulated with asbestos, Plaintiffs have not even cleared their first hurdle. Plaintiffs' only plaintiff-specific witness admitted that he could not recall working on a GE product. While Captain Moore's testimony is arguably sufficient to establish that Mr. Wanner and Mr. Shockley did *some* work on GE products, that testimony is not enough to bridge the gap.

Returning to the test laid out in *Lohrmann*, "there must be evidence of exposure to a specific product on a regular basis over some extended period of time in proximity to where the plaintiff actually worked." Plaintiffs have proved that there were GE

turbines in the place "where the plaintiff actually worked."  As previously noted though, under *Balbos*, the size of the aft engine room means that the mere presence of a GE product somewhere in the aft engine room is insufficient to defeat summary judgment. Without any evidence of regular work on a GE product, Plaintiffs cannot meet their burden *even if* they can prove that work on the GE products in the aft engine room gave off respirable asbestos. Plaintiffs have offered no such evidence.  Instead, they have devoted their opposition largely to Mr. Shockley's general exposure to asbestos aboard the Henderson.

As GE puts it in its reply, Plaintiffs spend much of their brief "discussing possible exposure from insulation on unspecified pipes aboard the USS Henderson.  But there is no evidence in the record that GE supplied those pipes, as opposed to the Navy's shipbuilder or some other vendor . . . It is completely speculative to link those unidentified pipes to GE." (ECF No. 113, at 9).  It is all the more speculative to do so in light of the fact that Mr. Wanner could not say definitively that he *ever* performed work on a GE product.  The totally speculative nature of the GE-specific evidence means that no reasonable juror could find that GE products were a substantial factor in causing Mr. Shockley's mesothelioma.

E.   **IMO (ECF Nos. 91, 92)**

"IMO is the entity currently responsible for responding to claims associated with certain naval equipment bearing the DeLaval

name." (ECF No. 91, at 3 n. 1). Plaintiffs have identified several DeLaval products which were present on board the Henderson at the time of its construction: (1) two Worthington main condensate pumps designed by DeLaval, (2) one Worthington motor driven auxiliary condensate pump designed by DeLaval, (3) one Buffalo turbine driven main feed booster pumps designed by DeLaval, and (4) two Buffalo motor driven auxiliary feed booster pumps designed by DeLaval, (5) two DeLaval motor driven main feed pumps, (6) two DeLaval turbine driven main feed pumps, (7) two DeLaval turbine driven main lube oil pumps, (8) two DeLaval motor driven main lube oil pumps, and (9) a DeLaval motor driven lube oil purifier pump. (ECF No. 107, at 14) (citing ECF No. 107-4). In his expert report, Captain Moore noted that certain of these products would have been located in the aft engine room where Mr. Shockley and Mr. Wanner worked. (ECF No. 107-6, at 8-10, 12, 13).

Captain Moore testified that:

> the machinery installed aboard the Henderson was robust machinery and was machinery that had a good track record of durability. It's my opinion more likely than not that the same pumps manufactured by DeLaval were installed on the Henderson remained installed on Henderson after the FRAM, but I do not have any specific documentation as to that fact.

(ECF No. 107-9, at 318-19). He also described the work that typically would have been done by sailors, including replacing packing every three to four months, (*id.* at 323), but not

performing an overhaul, (*id.* at 324), on the main lube oil pumps, (*id.* at 325).

Again though, any evidence of regular or frequent work on these DeLaval products is totally speculative.  Mr. Wanner could not recall any work done specifically on DeLaval products.  Mr. Wanner could not recall the name "DeLaval" until Plaintiff's counsel asked specifically about DeLaval in Mr. Wanner's deposition.  (ECF No. 107-5, at 313-14).  When asked what the name DeLaval meant to him, Mr. Wanner stated "[w]ell, I'm not sure if it's in the Navy or civilian.  DeLaval is big around my part of the country for dairy systems and stuff like that, so I'm not sure." (*Id.*).  As discussed more thoroughly above, without any evidence specific to work on DeLaval products, Plaintiffs can only establish *general* asbestos exposure, not DeLaval-specific asbestos exposure.  While Mr. Wanner was able to testify as to the type of work he did on the type of products manufactured by DeLaval – some of which seems likely to have exposed him to asbestos – there is no evidence that work specifically done on DeLaval products was a "substantial factor" in causing Mr. Shockley's mesothelioma.

## IV. Cross-Claims and remaining issues

Summary judgment will also be granted as to each of the remaining cross-defendants, as there is no evidence in the record

31

to support cross-plaintiffs' claims for contribution against them, and no parties have opposed these motions.

Plaintiffs have also vaguely asserted claims for punitive damages. As all of the substantive claims will be resolved in favor of all defendants, so too will all claims for punitive damages.

## V.   Conclusion

Plaintiffs have not put forward sufficient evidence to create a genuine dispute of material fact. While Plaintiffs have established that Mr. Shockley was exposed to asbestos during his time aboard the Henderson – and even that he was so exposed "on a regular basis over some extended period of time in proximity to where the plaintiff actually worked" – Plaintiffs have failed to carry that burden as to any *specific Defendant's products*. *Lohrmann*, 782 F.2d at 1162-63; *see also Lindstrom*, 424 F.3d at 492. Under these circumstances, no reasonable juror could find any individual Defendant's product or group of products were themselves a substantial factor in causing Mr. Shockley's mesothelioma. For the foregoing reasons, then, this court will grant each defendant's motion for summary judgment. Plaintiffs' motion for partial summary judgment will be denied as moot. A separate order will follow.

        /s/
_____
DEBORAH K. CHASANOW
United States District Judge
